UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
TIMOTHY M. AAS,

                Plaintiff,

                -against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,[1]

                Defendant.
---------------------------------------------------------------x

**MEMORANDUM & ORDER**

08-CV-4488 (DLI)

**DORA L. IRIZARRY, U.S. District Judge:**

      Plaintiff Timothy Aas filed an application for disability insurance benefits under the Social Security Act (the "Act") on June 6, 2005, claiming disability due to back pain beginning February 28, 2002. (A.R. at 67-73.)[2] Plaintiff's claim was denied initially because he was found capable of performing light work. (*Id*. at 32-35.) Plaintiff requested an administrative hearing, and on June 13, 2006, appeared before administrative law judge ("ALJ") David Nisnewitz. (*Id*. at 500-65.) On February 8, 2007, the ALJ denied plaintiff's claim, finding he was not disabled because he could perform light work. (*Id*. at 18-29.) This determination became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the ALJ decision on October 8, 2008. (*Id*. at 3-5.)

      Plaintiff brought the instant action to challenge the portion of the Commissioner's decision finding him "not disabled." Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings, affirming the determination that plaintiff was not disabled because he possessed the residual functional capacity ("RFC") to perform light work. Plaintiff cross-moves for judgment on the pleadings, seeking remand for additional administrative

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.

[2] Page citations are to the administrative record.

1

proceedings. For the reasons set forth below, the plaintiff's motion is granted, and this case is remanded for further proceedings consistent with this Order. The Commissioner's motion for judgment on the pleadings is denied.

## BACKGROUND

A.  **Non-medical and Testimonial Evidence**

Plaintiff was born on March 5, 1958, and was 48 years old at the time of the ALJ's decision. (A.R. at 502.) He became a firefighter with the New York City Fire Department ("FDNY") in 1981, and obtained a liberal arts Associates Degree from Queensborough Community College in 1996. (*Id*. at 68, 503.)

Plaintiff first injured his back in the fall of 1997 while working as a firefighter, pulling masks off an apparatus. (*Id*. at 396.) As a result, he underwent a laminectomy[3] and discectomy[4] on January 26, 1998. (*Id*. at 505.) Following the surgery, plaintiff returned to work as a firefighter, initially on light duty and eventually on full duty. (*Id*.) Subsequently, plaintiff re-injured his back on September 6, 2000, when he was propelled down a flight of stairs while fighting a fire. (A.R. at 506.) Following the second back injury, plaintiff returned to work in various light-duty assignments for the FDNY, such as a desk job, driving a training bus, and teaching. (*Id*. at 523-25.) On January 23, 2001, plaintiff applied for disability retirement from the FDNY due to "constant pain in lower back radiating down through left leg into foot aggravated by sitting, lifting, driving and strenuous and mild activity." (*Id*. at 371.) The FDNY granted plaintiff full disability due his back injury, "which is causally related to the injury of 11/13/97, and aggravated by the injury of 9/6/00." (*Id*. at 213.)

---

[3] Excision of a vertebral plate or removal of the posterior arch. THOMAS LATHROP STEDMAN, STEDMAN'S MEDICAL DICTIONARY 964 (Maureen Barlow Pugh, Lippincott Williams & Wilkins 2000) (1911).

[4] Excision in part or whole of an intervertebral disk. *Id*. at 508.

2

Since the second injury, plaintiff reported suffering from back spasms, shooting pains, daily hot sensations and pins and needles down his left leg and to his foot. (*Id*. at 515-16.) Plaintiff also described a loss of sensation in his left foot, which he called "drop foot." (A.R. at 534.) Additionally, plaintiff said this pain and discomfort can last for hours at a time. (*Id*.) To alleviate some of the pain, plaintiff frequently had to lie down, but had to change positions often, since "lying down is not a real solution." (*Id*. at 516.) Plaintiff also took over-the-counter medications, including Naprosyn, Aleve and aspirin, but claimed none of the medications significantly helped or lessened the pain. (*Id*.) He claimed that nothing he tried stopped the pain, but conceded he had never had an electromyography[5] ("EMG"), nor has he received any treatment for the pain related to the second injury. (*Id*. at 516-18.) Additionally, plaintiff acknowledged that he never tried trigger point injections to alleviate the pain because of negative side-effects associated with the procedure. (A.R. at 546.) Plaintiff testified that although doctors recommended he undergo a surgical procedure for his back pain, he has refused this option even though he described it as the "only solution," and admitted that surgery is "going to happen. I guess I'm just prolonging it." (*Id*. at 518, 545.)

Plaintiff also testified to his physical capabilities. He stated he could only sit for one to two hours in an eight-hour day, and reported, "I sit on my elbows. I don't really sit on my butt." (*Id*. at 520.) Additionally, he said he could only walk about three blocks before experiencing discomfort, and carry ten pounds of weight. (*Id*. at 520, 515.) He also experienced difficulty doing simple tasks, such as tying his shoelaces and cutting his toenails. (A.R. at 73, 520.) Plaintiff, however, admitted to engaging in recreational activity, including freshwater fishing, (*Id*. at 520), and traveling to his house in Pennsylvania multiple times, to Long Island, and to New Mexico at least two times since retiring (*Id*. at 511-12.)

---

[5] A graphic representation of the electric currents associated with muscular action. *Id*. at 576.

Plaintiff identified Dr. Flavio Crisari as his primary care physician. (*Id*. at 510.) He also received treatment from neurologist Dr. Paul Cooper, who performed surgery on plaintiff's back after the first injury. (*Id*. at 508.) However, plaintiff conceded he did not pursue further back treatment with respect to his second injury, and he stated he had not seen a doctor for treatment for two years prior to the administrative hearing. (A.R. at 517.)

Plaintiff also identified Dr. Linda Berman and Dr. Margie Solovay as his treating psychologists. Dr. Berman treated plaintiff on a weekly basis from April 1, 1999 through March 8, 2002, for marital problems and depression, which may be related to his back injury. (*Id*. at 527-28.) Plaintiff disagreed with Dr. Berman's assessment that he was alcohol dependent, and her recommendation for more intensive treatment for alcoholism. (*Id*. at 528-29.) This disagreement led to the termination of Dr. Berman's treatment of plaintiff. (*Id*. at 529.) Although plaintiff disagreed that he was alcohol dependent, and claimed he had never entered an alcohol program, he later admitted to having attended Alcoholics Anonymous meetings because he was concerned with his drinking. (*Id*. at 530-32.) Plaintiff also denied ever discussing alcohol related issues with his primary care physician, Dr. Crisari. (A.R. at 556.) Most recently, plaintiff attended weekly treatment with Dr. Solovay, starting in March 2006, for depression, anxiety and sleeplessness. (*Id*. at 551-52.)

B. **Medical Evidence**

1. **Medical Evidence Prior to Plaintiff's Alleged Disability Onset Date**

Plaintiff started seeing Dr. Crisari in 1991, primarily for allergy treatment. (*Id*. at 448.) Following plaintiff's first back injury, Dr. Crisari noted his complaints of lower back pain that radiated throughout his lower left side, on September 3, 1997. (*Id*. at 460.) There were no further remarks regarding plaintiff's back pain in Dr. Crisari's treatment notes through September 7,

2000, the date of the second back injury. (*Id*. at 460-66.) Although plaintiff claimed not to have discussed his drinking habits with Dr. Crisari, there were multiple references to his drinking in Dr. Crisari's notes. (*Id*. at 464-65.) On April 21, 1999, Dr. Crisari noted that plaintiff was drinking six to eight beers per week. (A.R. at 464.) At that time, Dr. Crisari advised plaintiff to discontinue drinking alcohol, and, one month later, the doctor noted plaintiff had indeed ceased drinking. (*Id*. at 465.)

After plaintiff's first back injury, the FDNY took an X-ray of his lower back on November 17, 1997, which showed no fracture or dislocation. (*Id*. at 250.) An MRI taken on November 26, 1997 showed a large left posterolateral disc herniation at the L5-S1 level that was impinging on the S1 root. (*Id*. at 211.) Plaintiff saw Dr. Paul Cooper, a neurosurgeon, for this back injury. On January 22, 1998, Dr. Cooper performed a L5-S1 laminectomy and discectomy on plaintiff, in which he removed a large herniated fragment and multiple smaller fragments from the disc space. (*Id*. at 166-67.) Following the surgery, Dr. Cooper noted plaintiff was doing well and was experiencing much less pain. (A.R. at 162.) One month later, in March 1998, Dr. Cooper reported plaintiff was doing well and recommended he return to light duty on April 15, 1998 because he was feeling "virtually no pain." (*Id*. at 219.) On October 14, 1998, Dr. Cooper stated plaintiff could return to work as a firefighter on "full duty without restrictions." (*Id*. at 223.)

Plaintiff received post-surgical orthopedic aftercare from the FDNY from February 23, 1998, to October 16, 1998. (*Id*. at 283, 286-94.) On October 16, 1998, Dr. Kelly, the FDNY's Chief Medical Officer, examined plaintiff after he requested to return to full duty. (*Id*. at 386.) Dr. Kelly found plaintiff had normal reflex, strength and sensation in his lower extremities. (A.R.

at 386.) Thus, Dr. Kelly cleared plaintiff to return to full duty on November 23, 1998, after he completed a retraining course. (*Id.*)

On September 6, 2000, plaintiff was examined again by the FDNY due to the second back injury. (*Id.* at 272.) Plaintiff was noted to have fallen down a flight of stairs at a fire scene and to have piriformis syndrome[6]. (*Id.* at 271.) An MRI performed on September 20, 2000 showed disc degeneration at L4/L5 and L5/S1, with greater degeneration occurring at the L5/S1 location. (*Id.* at 209.) The impression from the MRI was "L4/L5 disc herniation and facet arthropathy[7]" and "L5/S1 left paracentral and lateral disc herniation." (A.R. at 210.)

Plaintiff's neurosurgeon, Dr. Cooper, drafted a letter to the FDNY on plaintiff's behalf on October 11, 2000. (*Id.* at 212.) He noted that plaintiff was experiencing increased back pain, which was "increased with sitting, physical activity, and carrying heavy objects." (*Id.*) After examining plaintiff, Dr. Cooper reported, "straight leg raising on the left produces posterior thigh tightness only. Motor examination is intact. There is decreased sensation in the S1 distribution on the left . . . decreased left ankle reflex." (*Id.*) In conclusion, Dr. Cooper stated that plaintiff had done well after the procedure in 1998, but after his second back injury, it was unreasonable to expect plaintiff to return to heavy duty work as a fireman. (*Id.*) He recommended plaintiff try light duty work, but "if that is not tolerated then he might have to accept retirement from the Fire Department." (A.R. at 212.) An October 16, 2000 FDNY report indicated plaintiff did, in fact, return to light duty work.

On October 25, 2001, Dr. Kelly examined plaintiff regarding his complaints of persistent back pain, with limited lifting ability and difficulty sitting for long periods of time. (*Id.* at 372.)

---

[6] A condition in which the piriformis muscle exerts pressure on the sciatic nerve, causing pain, tingling, and weakness of lower limb muscles. J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE 258 (2009).

[7] Disease affecting the joints. STEDMAN, *supra* note 3, at 150.

His lumbro sacral spine exam revealed lumbar motions within normal limits with some pain during extension and rotational motions. (*Id.*) Reflex tests were "2+ knee jerks bilaterally symmetrically, right equals left, however ankle reflexes were symmetrically absent. Straight leg raises were negative bilaterally." (*Id.*) Additionally, strength testing of lower extremities was within normal limits, with sensation intact. (*Id.*)

### 2. Medical Evidence After Plaintiff's Alleged Disability Onset Date

After the alleged disability onset date, February 28, 2002, Dr. Crisari's reports did not indicate any back problem, but instead noted that plaintiff had "no complaints." (*See* A.R. at 468-476.) However, on March 27, 2002, the FDNY Medical Board recommended accident disability retirement for plaintiff. (*Id.* at 213.) Based on the review of the September 2000 MRI and Dr. Cooper's October 2000 report, the Board issued an unanimous opinion granting plaintiff accident disability retirement and said, accordingly, "he may engage in a suitable occupation." (*Id.*)

Dr. Mohammed Asif Iqbal performed a consultative orthopedic evaluation at the request of the New York state agency responsible for adjudicating plaintiff's disability claim at the initial level on June 23, 2005. (*Id.* at 113-16.) Dr. Iqbal observed that plaintiff was in no acute distress. (*Id.* at 114.) He reported plaintiff had a normal gait, could walk on his heels and toes without difficulty, could squat fully, used no assistive device, needed no help changing for the exam or getting on or off the exam table, and was able to rise from the chair without difficulty. (A.R. at 114.) Additionally, Dr. Iqbal stated plaintiff's hand and finger dexterity was intact, with a grip strength of 5/5 bilaterally. (*Id.*) Furthermore, plaintiff's cervical spine was able to engage in full flexion, extension, lateral flexion bilaterally and rotary movements bilaterally, with no cervical or paracervical pain or spasm. (*Id.*) Plaintiff was observed to have tenderness in the LS area and

7

left SI joint of his thoracic and lumbar spines, but had no spasm, scoliosis[8] or kyphosis.[9] (*Id*.) Dr. Iqbal also noted that sitting produced mild back pain on the back side for plaintiff, but there were no particular trigger points noticed. (*Id*. at 114-15.) Plaintiff was further observed to have "full ROM of hips, knees and ankles bilaterally," with his muscle strength on the left side at a 4+/5, no muscle atrophy, no sensory abnormality, and no joint effusion, inflammation or instability. (A.R. at 115.) The X-ray performed on plaintiff's lumbar sacral spine showed the disc space narrowing at L5-S1 and straightening of the lordoctic curve.[10] (*Id*. at 115.)

Dr. Iqbal's prognosis for plaintiff was "guarded." (*Id*.) He opined that plaintiff had no limitation to button or zip his clothes, or to tie his shoelaces. (*Id*.) Furthermore, Dr. Iqbal opined that plaintiff had no limitations on sitting, standing or walking short distances, but that he may have a moderate limitation on prolonged walking and lifting weight. (*Id*.) He also recommended plaintiff be evaluated by an orthopedic doctor. (A.R. at 115.)

Dr. Luke Han also performed a consultative examination for plaintiff, focused on internal medicine, on November 11, 2005. (*Id*. at 123-27.) Plaintiff's chief complaint was shortness of breath and herniated discs. (*Id*. at 123.) At the time of the examination, plaintiff had "pain in his left buttock that radiates to the left foot," some numbness of his left leg and tingling of the side of his back. (*Id*.) Plaintiff described the pain as a "hot, burning sensation," which came in waves that brings the pain from its usual level of 6/10 to an increased level of 10/10. (*Id*.) Dr. Han described plaintiff's daily capabilities, which included driving, cooking, cleaning and shopping. (A.R. at 124.) He also noted that plaintiff showered, bathed, and dressed himself, but conceded plaintiff was limited to easy chores. (*Id*.) Additionally, Dr. Han reported that plaintiff appeared to be in no acute distress, with normal gait and the ability to walk on heels and toes, squat fully,

---

[8] Abnormal lateral and rotational curvature of the spine. *Id*. at 1606.
[9] A hump prominent on the spine. *Id*. at 955.
[10] Marked by an anteriorly convex curvature of the spine. *Id*. at 1032.

change for the exam, and get on and off the exam table and chair without difficulty. (*Id*.) With respect to plaintiff's back pain, Dr. Han found that plaintiff had full flexion, extension, and rotary movement, but noted tenderness of the paraspinal muscles in the left lumbar area and the left side of the sciatic notch.[11] (*Id*. at 125-26.) Plaintiff was also found to have hand and finger dexterity intact, with grip strength of 5/5 bilaterally. (*Id*. at 126.) Dr. Han concluded that plaintiff had a "moderate restriction for heavy lifting and carrying." (A.R. at 126.)

D. Chauvin, a disability analyst for the New York State Office of Temporary and Disability Assistance's Disability Determination Division, examined the record on October 14, 2005. (*Id*. at 142-47.) After reviewing the record, he determined that plaintiff retained the ability to occasionally lift or carry 20 pounds, and frequently lift or carry 10 pounds. (*Id*. at 143.) Additionally, plaintiff was found capable of standing or walking about 6 hours in an 8-hour work day, sitting for a total of 6 hours in an 8-hour work day, and without any limitations on his ability to push or pull. (*Id*.) Plaintiff was also found to have occasional limitations in climbing ramps, and stairs, balancing, stooping, kneeling, crouching and crawling. (*Id*. at 144.) Chauvin cites Dr. Iqbal's examination for the determination of plaintiff's abilities. (A.R. at 143.)

On March 6, 2006, Dr. Crisari completed a Physical Residual Functional Capacity Questionnaire. (*Id*. at 483- 85A.) Dr. Crisari said plaintiff had lower back pain in 1997, which radiated down his left lower extremities. (*Id*. at 483.) He declined to answer specific questions regarding plaintiff's physical capabilities, but said the number of city blocks plaintiff could walk without rest or severe pain depended on the presence or absence of pain. (*Id*. at 485.) Furthermore, Dr. Crisari reported no psychological conditions that affected plaintiff's physical condition. (*Id*. at 484.)

---

[11] Situated around the hip joint. STEDMAN, *supra* note 3, at 1602.

Plaintiff began treatment with Dr. Linda Berman, a psychologist, on April 1, 1999. (A.R. at 442.) She diagnosed plaintiff with Major Depressive Disorder (recurrent and moderate), and Alcohol Dependence. (*Id*.) Dr. Berman's therapy focused on treating plaintiff's depressive symptoms and teaching him relaxation techniques to help manage his pain. (*Id*.) Treatment was terminated with plaintiff on March 8, 2002 because he was non-complaint with Dr. Berman's recommendations for more intensive alcohol treatment. (*Id*.) On May 9, 2006, Dr. Berman completed a Mental Impairments Questionnaire on behalf of plaintiff. (*Id*. at 442-47.) Dr. Berman stated plaintiff experienced the following symptoms: appetite disturbance with weight change, sleep disturbance, emotional lability, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, suicidal ideations or attempts, social withdrawal or isolation, decreased energy, and generalized persistent anxiety. (A.R. at 443-44.) Plaintiff's prognosis was "guarded" with some functional limitations as a result of his mental impairments. (*Id*. at 445-46.) These limitations included (1) slight restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) frequent deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and (4) repeated (three or more) episodes of deterioration or decompensation in work or work-like setting which cause the individual to withdraw from the situation or experience exacerbation of signs and symptoms. (*Id*. at 446-47.)

On March 1, 2006, plaintiff began psychological treatment with Dr. Margie R. Solovay, and was continuing weekly treatment with her at the time of the administrative hearing. (*Id*. at 494.) On May 30, 2006, Dr. Solovay completed a Mental Impairments Questionnaire regarding plaintiff's capabilities. (*Id*.) Dr. Solovay stated that when she started treating plaintiff, his life

had "become a struggle instead of an enjoyable experience" and that "his depression and anxiety have gotten worse in recent years." (A.R. at 494.) Plaintiff was diagnosed with Dysthymic Disorder,[12] which Dr. Solovay stated was less ameliorable due to his "chronic physical disability." (*Id.*) Plaintiff's symptoms included: (1) great difficulty falling asleep; (2) personality and emotional changes; (3) definite lessening of interests; (4) feelings of guilt/worthlessness (somewhat); (5) difficulty thinking or concentrating; (6) social withdrawal or isolation (somewhat); (7) decreased energy; (8) obsessions and compulsions about getting old, dying, getting injured and having another back surgery; (9) intrusive thoughts; (10) persistent irrational fears; and (11) generalized persistent anxiety. (*Id.* at 496-96A.) Dr. Solovay also stated that plaintiff's mental state was normal, but that his tendency for anxiety interfered with tasks at times. (*Id.* at 496A.) Plaintiff's prognosis was "probable amelioration of depressive symptoms" with continued treatment. (*Id.* at 497.) Furthermore, Dr. Solovay predicted that plaintiff's impairments or treatment would cause him to be absent from work for less than a month, and that any difficulty in working a regular job "would be due to physical impairment, not emotional." (*Id.* at 498.) In sum, Dr. Solovay listed plaintiff's functional limitations as (1) slight restriction of activities of daily living; (2) slight difficulties in maintaining social functioning; and (3) often experiencing deficiencies in concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (A.R. at 498.)

Dr. Harold James performed an initial examination of plaintiff on June 8, 2006. (*Id.* at 487-89.) Plaintiff complained of daily lower back pain, which produced a tingling sensation in his left buttocks that occasionally radiated into his left foot. (*Id.* at 487.) Dr. James described plaintiff's general appearance as a "well-nourished, well-developed, 48-year-old male, in no

---

[12] A chronic disturbance of mood characterized by mild depression or loss of interest in everyday activities. *Id.* at 526.

acute distress." (*Id.* at 488.) Dr. James noted plaintiff had a positive leg raise of 30 degrees for his left leg, and 45 degrees for his right leg, and both his upper and lower extremities were rated 5/5, with no motor or sensory deficits. (*Id.*) Additionally, Dr. James observed plaintiff's back had paravertebral tenderness to palpitation at L2-S1 with possible bilateral muscle spasms, and his deep tendon reflexes at "2+ and equal, bilaterally, throughout, except left ankle reflex is diminished." (A.R. at 488.) Although he found only slight impairments during the examination, Dr. James nevertheless found plaintiff was "totally disabled from any and all jobs" due to "chronic low back pain status post surgery and an exacerbation by a fall in 2000." (*Id.* at 489.)

Based upon his initial examination, Dr. James completed a Lumbar Spine Residual Functional Capacity Questionnaire on June 9, 2006. (*Id.* at 490-93.) He summarized plaintiff's symptoms as "constant pain in the lumbar spine area with intermittent exacerbation of muscle spasms, tingling sensations in the left buttock occasionally radiating to the left foot. (*Id.* at 490.) Additionally, Dr. James estimated plaintiff's impairments limited him to be able to walk only two or three city blocks without rest or severe pain, able to sit or stand/walk zero hours in an 8-hour work day, able to carry less than 10 pounds, and significantly limited in reaching, handling, fingering, bending and twisting at the waist. (*Id.* at 491-92.)

## DISCUSSION

### A.   Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 1383(c)(3). A district court reviewing the final determination of the Commissioner must determine whether the ALJ applied

the correct legal standards and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). "Substantial evidence" is defined as "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur*, 722 F.2d at 1038. The court also must "keep[ ] in mind that it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Indeed, in evaluating the evidence, "[t]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted).

After its review, the district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168

F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

**B.     Disability Claims**

In order to receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), 423(d). Claimants establish disability by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence that the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll*, 705 F.2d at 642.

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520.

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied. 20 C.F.R. §§ 404.1520(a), (b), 416.920(a), (b) (1983). If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" set forth in subpart P, app. 1, of the social security regulations, 20 C.F.R. §§ 404.1520(d), 416.920(d). These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits. If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," i.e., his capacity to engage in basic work activities, and a

decision whether the claimant's residual functional capacity permits him to
engage in his prior work. If the residual functional capacity is consistent with
prior employment, benefits are denied. 20 C.F.R. §§ 404.1520 (e), 416.920(e). If
not, the fifth and final step is a decision whether a claimant, in light of his residual
functional capacity, age, education, and work experience, has the capacity to
perform "alternative occupations available in the national economy." *Decker v.
Harris*, 647 F.2d 291, 298 (2d Cir. 1981); 20 C.F.R. §§ 404.1520(f), 416.920(f).
If not, benefits are awarded.

. . . .

If the claimant satisfies the burden of proof through the fourth step, she
has established a prima facie case and the burden shifts to the Commissioner to
prove the fifth step—that there exists alternative substantial gainful employment
in the national economy that the claimant can perform considering not only her
physical capacity but also her age, education, experience, and training. *See id.*,
717 F.2d at 722-23; *see also Rodriguez*, 1998 WL 150981, at *7; *Crean v.
Sullivan*, No. 91 Civ. 7038, 1992 WL 183421, at *4 (S.D.N.Y. July 22, 1992). In
meeting his burden of proof on the fifth step, the Commissioner, under
appropriate circumstances, may rely on the medical vocational guidelines
contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the
grids." The grids take into account the claimant's residual functional capacity in
conjunction with the claimant's age, education and work experience. Based on
these factors, the grids indicate whether the claimant can engage in any other
substantial gainful work which exists in the national economy. Generally the
result listed in the grids is dispositive on the issue of disability. However, the
grids are not dispositive where they do not accurately represent a claimant's
limitations because the claimant suffers from non-exertional limitations that
significantly diminish her capacity to work. *Pratts v. Chater*, 94 F.3d 34, 38 (2d
Cir.1996); *Rosa v. Commissioner of Social Sec.*, No. 97 Civ. 1615, 1998 WL
106134, at *3 (S.D.N.Y. MA.R. 10, 1998); *Zorilla v. Chater*, 915 F. Supp. 662,
667 (S.D.N.Y.1996).

*Zwick v. Apfel*, 1998 WL 426800, at *7 n.7 (S.D.N.Y. July 27, 1998) (some citations omitted).

## C.     ALJ's Decision

In this case, the ALJ applied the five-step analysis and ultimately found plaintiff not

disabled. The ALJ resolved step one in plaintiff's favor, finding that plaintiff had not engaged in

substantial gainful activity since the onset of his alleged disability. (A.R. at 20.) At step two, the

ALJ found that plaintiff had a severe impairment: "back disorder." (*Id*.) The ALJ resolved step

three against plaintiff, finding that he had no impairment that meets or medically equals the

criteria of any of the listed impairments described in Appendix 1 of 20 C.F.R. § 404.1520(d). (*Id*.) At the fourth step, the ALJ analyzed plaintiff's RFC. The ALJ found that plaintiff remained capable of performing "light work: to lift and carry twenty . . . pounds occasionally and ten . . . pounds frequently; to sit, stand and walk (6) hours out of an eight (8) hour day; and to push and pull with the extremities without limitation." (*Id*.) Additionally, the ALJ found plaintiff retained the RFC to "engage in vocationally relevant mental activities: to understand and remember; to maintain attention; to respond appropriately in a workplace setting, without significant limitations." (*Id*.) The ALJ next determined that plaintiff could not perform his past relevant work as a firefighter. At the fifth and final step, the ALJ concluded that plaintiff could perform light work, and that there were a significant number of jobs in the national economy that plaintiff could perform. (*Id*. at 28-29.) The ALJ made this conclusion, however, without mentioning plaintiff's alleged nonexertional limitations.

**D.     Application**

          **1.     The ALJ Did Not Consider Plaintiff's Alleged Affective Disorder**

A "nonexertional limitation" is a limitation related to impairments or symptoms, such as pain, that affect the claimant's ability to meet job demands other than strength demands. SSR 83-14; *Zwick v. Apfel*, 1998 WL 426800, at *7 n.7 (S.D.N.Y. July 27, 1998). Examples of nonexertional limitations include, "nervousness, inability to concentrate, difficulties with sight or vision, an inability to tolerate dust or fumes, and difficulty performing manipulation or postural functions of some work such as reaching, stooping, climbing, crawling or crouching." *Zwick*, 1998 WL 426800, at *7 n.7. Mental activities are also considered nonexertional. SSR 83-14. Since different jobs require varying levels of mental functioning, such as intellectual and behavioral capabilities, "exposure to particular work stresses may not be medically sustainable

for some persons with mental impairments, as would be the case with some persons who have physical impairments." *Id*. Furthermore, even though mental impairments are considered to be nonexertional, conditions such as depression may also affect a person's exertional capacity. *Id*.

If a claimant only suffers from an exertional impairment, described as a strength limitation, the Commissioner may rely on the Medical-Vocational Guidelines ("the grids") to satisfy his burden of proof for the final determination of disability. *See Pratts v. Chater*, 94 F.3d 34, 38-39 (2d. Cir. 1996). However, if the claimant suffers an additional, nonexertional impairment, "'the grid rules may not be controlling' and 'the guidelines could not provide the exclusive framework for making a disability determination.'" *Id*. (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d. Cir. 1986)). Where the claimant's nonexertional impairments significantly diminish the range of work his exertional limitations permit, sole reliance on the grids for a disability determination is inappropriate "because they fail to take into account claimant's nonexertional impairments." *Id*. at 39. A nonexertional impairment that significantly diminishes a claimant's work ability is one that results in "additional loss of work capacity beyond a negligible one, or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp*, 802 F.2d at 606.

When a claimant's nonexertional impairment significantly diminishes his work ability, the testimony of a vocational expert must be introduced to prove that jobs exist in the national economy which the claimant can obtain and perform. *Bapp*, 802 F.2d at 603; *accord Pratts*, 94 F.3d at 38-39. Thus, prior to rendering a disability determination, the ALJ must first consider "the intermediate question-whether the range of work [claimant] could perform was so significantly diminished [by the nonexertional impairment] as to require the introduction of vocational testimony." *Bapp*, 802 F.2d at 606. When an ALJ fails to consider this intermediate

question, the claim must be remanded. *Id*.; *see also Pratts*, 94 F.3d at 39 (remanding where the "ALJ simply proceeded directly to the ultimate question of disability without first considering whether further testimony was necessary in light of [claimant's] nonexertional impairments").

Here, after analyzing plaintiff's RFC and deciding that he was incapable of engaging in his prior work, the ALJ found that the grids directed a conclusion that plaintiff was not disabled. However, the ALJ skipped the intermediate question by failing to consider whether plaintiff's alleged mental impairments/affective disorder so significantly diminished his work ability that testimony from a vocational expert was required. The ALJ's failure was legal error, and requires remand. *See Bapp*, 802 F.2d at 606; *Pratts*, 94 F.3d at 39. The Commissioner argues that no reading of the nonexertional evidence could support the finding that they were significant. Even if correct, this argument misses the point. The ALJ failed entirely to make this determination, and for that reason, remand is required.

**2. D. Chauvin is a Disability Analyst, Not a Physician**

One final issue warrants discussion. In reaching a determination as to plaintiff's RFC, the ALJ afforded the "State agency medical consultant's report" of D. Chauvin "great weight." (A.R. at 27.) However, it appears that Chauvin crossed out the words "medical consultant" above the signature line on the Physical Residual Functional Capacity Assessment form, and instead titled himself "disability analyst." (*Id*. at 27, 147.) Moreover, elsewhere in the record, Chauvin is identified as a "Disability Examiner." (*Id.* at 31.) Thus, it appears the ALJ mistook Chauvin for a physician. Indeed, the Commissioner appears to concede this point. (*See* Mem. in Opp'n at 5-6.) On remand, the Commissioner is directed to reconsider Chauvin's status and the proper weight that should be afforded to Chauvin's opinion. *See Beckles v. Barnhart*, 340 F.2d.

285, 290 (E.D.N.Y. 2004) (remanding where ALJ gave "considerable weight" to the functional assessment of "a state agency disability adjudicator" that the ALJ mistook for a physician).

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied and plaintiff's motion for judgment on the pleadings is granted. Accordingly, this case is remanded to the Commissioner, pursuant to the fourth sentence of 42 U.S.C. § 405(g), to consider whether testimony from a vocational expert is required and reconsider Chauvin's status and the proper weight that should be afforded to Chauvin's opinion. The Commissioner is directed to prevent further delay in the processing of Plaintiff's case and to expedite the additional administrative proceedings. If Plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty (60) days of Plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 388 (2d Cir. 2004) (suggesting procedural time limits to ensure speedy disposition of Social Security cases upon remand by district courts).

SO ORDERED.

DATED:  Brooklyn, New York
        September 29, 2010

                                            _____/s/_____
                                            DORA L. IRIZARRY
                                            United States District Judge